IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

RANGER CONSTRUCTION INDUSTRIES, INC.,

                    Plaintiff,

v.                                        CASE NO.: 9:17-CV-81226-KAM

ALLIED WORLD NATIONAL ASSURANCE
COMPANY,

                    Defendant.
_____/

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant, ALLIED WORLD NATIONAL ASSURANCE COMPANY ("AWAC") by and through its undersigned counsel, hereby files its Motion for Summary Judgment on Counts I (Breach of Contract) and II (Declaratory Relief) of the Amended Complaint filed by RANGER CONSTRUCTION INDUSTRIES, INC. ("Ranger"). In support thereof, AWAC states as follows:

1. On or around March 5, 2017, Jennifer Astaphan, as Personal Representative of the Estate of Jonathan R. Astaphan ("Estate of Astaphan), filed suit against Ranger in relation to a fatal traffic accident occurring on May 28, 2015 ("the underlying matter"). The underlying matter was tried, ultimately resulting in a jury verdict awarding Ms. Astaphan $20,000,000 in compensatory damages and awarding punitive damages directly against Ranger in the amount of $25,000,000 ("the Astaphan verdict").

2. On December 15, 2017, Ranger filed an Amended Complaint against AWAC in the instant action. [DE 12]. In Counts I and II of Ranger's Amended Complaint, Ranger alleges that AWAC breached its duty to cooperate under the Policy by failing to initiate settlement discussions and accept reasonable settlement opportunities. [*Id.* at p. 9, ¶¶ 66, 67; p. 11, ¶ 75; p. 12, ¶ 85(a)].

3. Additionally, Ranger alleges that under the terms of the Policy, AWAC is obligated to pay the punitive damages assessed against Ranger in the underlying matter. [*See* DE 12 at pp. 13-14].

4.     As set forth herein, AWAC is entitled to entry of summary judgment on Counts I and II of Ranger's Amended Complaint because, as a matter of law, AWAC did not breach the Policy and there is no coverage under the Policy for the punitive damages assessed directly against Ranger in the underlying matter. *Id.*

## I.    STANDARD OF LAW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see also Celotex Corp. v. Cattrett*, 477 U.S. 317, 323 (1986). Further, the interpretation of an insurance contract is inherently a question of law. *See James River Ins. Co. v. Ground Down Engineering, Inc.*, 540 F.3d 1270, 1274 (11th Cir. 2008).

## II.   THE PUNITIVE DAMAGES ASSESSED BY THE JURY AGAINST RANGER IN THE UNDERLYING MATTER ARE NOT COVERED UNDER THE POLICY PURSUANT TO FLORIDA LAW

"Florida law does not allow indemnification against punitive damages." *Herendeen v. Mandelbaum*, 232 So.3d 487, 492 (Fla. 2d DCA 2017)(citing *Queen v. Clearwater Elec., Inc.*, 555 So.2d 1262, 1266 (Fla. 2d DCA 1989); *Nicholson v. American Fire & Cas. Ins. Co.*, 177 So.2d 52 (Fla. 2d DCA 1965); *Northwestern National Cas. Co. v. McNulty*, 307 F.2d 432 (5th Cir. 1962). "The purpose of punitive damages is, as the name indicates, to punish one whose wrongdoing surpasses mere mistake, negligence or thoughtlessness and to deter others from similar misconduct." *U.S. Concrete Pipe Co. v. Bould*, 437 So.2d 1061, 1066 (Fla. 1983) (Ehrlich, J., concurring). "If the burden of paying that penalty may be shifted to an insurer (and ultimately to society at large), the wrongdoer has no impetus to 'learn his lesson' and change his behavior." *Id.* at 1066. The limited exception to this rule previously arose in Florida in circumstances where an employer was held vicariously liable for punitive damages for the willful, wanton, or malicious actions of an employee acting within the course and scope of employment. S*ee Traveler Indem. Co. v. Despain*, 2006 WL 3747318, *3 (M.D. Fla. 2006). More specifically, decades ago, Florida juries could impose punitive damages against employers solely based upon the employer-employee relationship without considering the employer's independent conduct. *See Nichols v. McGraw,* 152 So.2d 486 (Fla. 1st DCA 1963). Thus, the limited exception to the proscription against insuring punitive damages applied only because vicariously awarded punitive damages were not imposed to punish or deter the conduct of the

employer. *See Despain*, 2006 WL 3747318, *3 (M.D. Fla. 2006)("Florida's public policy does not preclude insurance coverage of punitive damages **when the insured himself is not personally at fault**, but is merely vicariously liable for another's wrong.")(emphasis added). "The rationale underlying this exception is obvious. When an employer's liability for punitive damages arises solely from the fact that he relies upon employees, there can be no action to punish or deter." *Bould*, 437 So.2d at 1066 (Fla. 1983) (Ehrlich, J., concurring).

In 1981, the Florida Supreme Court decided *Mercury Motors Express, Inc. v. Smith*, 393 So.2d 545 (Fla. 1981), which held that "before an employer may be held vicariously liable for punitive damages under the doctrine of *respondeat superior*, there must be some fault on his part." *Id.* at 549. Thus, for some time (before Florida's 1999 Tort Reform Act), a finder-of-fact could impose vicarious punitive damages against an employer based on the willful and wanton misconduct of an employee acting in the course and scope of employment when there was "some fault" on the part of the employer which foreseeably contributed to the plaintiff's injury. *See id.* The Florida Supreme Court in *Mercury Motors* clarified that "although the misconduct of the employee, upon which the vicarious liability of the employer for punitive damages is based, must be willful and wanton, it is not necessary that the fault of the employer, independent of his employee's conduct, also be willful and wanton." *Id.* In such cases, where punitive damages were assessed against an insured-employer based solely on vicarious liability, the vicarious punitive damages were still insurable because "'[s]ome fault' does not necessarily rise to the level of misconduct for which society demands punishment and deterrence." *Bould*, 437 So.2d at 1066 (Ehrlich, J., concurring).

The Florida Supreme Court also clarified in *Schropp v. Crown Eurocars, Inc.*, 654 So. 2d 1158 (Fla. 1995) that under a theory of vicarious liability for punitive damages, it was "not necessary for the plaintiff to establish that the corporate employer acted with the same heightened culpability as the employee to allow punitive damages." *Id.* at 1160. Rather, all that was required was a showing of "**ordinary negligence** on the part of the corporate employer." *Id.* (emphasis added). The foregoing made clear that the level of employer conduct for vicarious punitive damages following the *Mercury Motors* decision, requiring "some fault" did not entail that the employer's conduct amount to conduct warranting punitive damages itself.

However, in 1999, the Florida legislature amended Fla. Stat. § 768.72 to allow recovery of punitive damages against a defendant based on clear and convincing evidence of "intentional

3

misconduct" or "gross negligence." 1999 Fla. Laws, ch. 99-225, § 22. Specifically, Fla. Stat. § 768.72(2) (2018) provides that, "A defendant may be held liable for punitive damages *only if* the trier of fact, based on clear and convincing evidence, *finds that the defendant was personally guilty of intentional misconduct or gross negligence*." *Id*. (emphasis added).

Further, and more importantly, the Florida legislature abolished the imposition of vicarious punitive damages through its enactment of § 768.72(3) by establishing, "a heightened standard for imposing punitive damages on an employer rather than adopting the common law rules of agency and vicarious liability." *HCA Health Services of Florida, Inc. v. Byers-McPheeters*, 201 So.3d 669 (Fla. 4th DCA 2016) (citing *Coronado Condo. Ass'n, Inc. v. La Corte*, 103 So.3d 239, 241 (Fla. 3d DCA 2012)). Fla. Stat. § 768.72(3) provides, in its entirety, that:

In the case of an employer, principal, corporation, or other legal entity, punitive damages may be imposed for the conduct of an employee or agent only if the conduct of the employee or agent meets the criteria specified in subsection (2) and:

(a) The employer, principal, corporation, or other legal entity actively and knowingly participated in such conduct;

(b) The officers, directors, or managers of the employer, principal, corporation, or other legal entity knowingly condoned, ratified, or consented to such conduct; or

(c) The employer, principal, corporation, or other legal entity engaged in conduct that constituted gross negligence and that contributed to the loss, damages, or injury suffered by the claimant.

As set forth *supra*, prior to the amendment of Fla. Stat. § 768.72 in 1999, the standard for punitive damages on an employer was solely set forth in Florida case law, specifically, the standard set forth in *Mercury Motors*. The Florida Legislature, prior to 1999, had not spoken regarding the standard for the imposition of punitive damages against an employer. [*See* Ch. 99–225, § 22, Laws of Fla., attached hereto as Ex. A]. The enactment of § 768.72(3), eliminated the option of imposing vicarious punitive damages based on the employer having only "some fault" or ordinary negligence and evidences the intent of the Legislature to extinguish the prior standard set forth in *Mercury Motors* and *Schropp*. In other words, the enactment of § 768.72(3) by the Florida Legislature conclusively resolved whether an employer could be held vicariously liable for the punitive damages of its employee and the Legislature clearly decided that an employer can only be found liable for punitive damages if the employer itself is directly guilty of punitive

4

conduct. This is further evident based on the fact that the same standard imposed to find the employee guilty of punitive damages is the same as that for the employer, clear and convincing evidence. The Legislature did not establish a separate burden of proof from that of the employee when imposing punitive damages on an employer. Thus, as set forth more fully below, employers in Florida can only be found liable for punitive damages if they themselves commit punitive conduct. Therefore, because Fla. Stat. § 768.72(3) requires the employer itself to be guilty of punitive conduct, the damages awarded under this subsection are not insurable under Florida law. *Herendeen v. Mandelbaum*, 232 So.3d 487, 492 (Fla. 2d DCA 2017)("Florida law does not allow indemnification against punitive damages."). Accordingly, AWAC is entitled to entry of summary judgment, because as a matter of law, there can be no coverage for the punitive damages award rendered directly against Ranger under the Policy.

A. **FLORIDA STATUTE § 768.72 PROVIDES THAT ALL PUNITIVE DAMAGES AWARDED AGAINST AN EMPLOYER UNDER ANY OF ITS SUB-SECTIONS ARE DIRECT PUNITIVE DAMAGES, NOT VICARIOUS.**

AWAC is entitled to summary judgment on the issue of coverage because Florida law no longer allows a trier-of-fact to impose punitive damages against an employer based on a theory of vicarious liability; therefore, there can be no insurance coverage for the punitive damages award rendered directly against Ranger in the underlying matter. Rather, following the Florida Legislature's 1999 Tort Reform Act, the only means of awarding punitive damages against an employer based on the conduct of an employee or agent requires a trier-of-fact to find a high level of culpable conduct on the part of that employer, corporation, or legal entity. Notably, nowhere in Fla. Stat. § 768.72(3), or at any place in the statute, are the words vicariously liability used in any context. The Florida Legislature is well aware of how to use specific words and phrases, such as vicarious liability, and how to place such phrases in a statute when that is their intent. "The Legislature's intent must be determined primarily from the language of the statute." *Rollins v. Pizzarelli*, 761 So.2d 294, 297 (Fla. 2000). In this case, the Florida Legislature omitted the phrase vicarious liability from Fla. Stat. § 768.72 because the Legislature intended to eliminate the imposition of purely vicarious punitive damages. Further, as set forth *supra*, the enactment of Fla. Stat. § 768.72(3) in 1999 is evidence in and of itself of the Legislature's clear intent to overrule the previous standard set forth in *Mercury Motors* and to instead require that an employer be guilty of punitive conduct itself to be held liable for punitive damages.

5

Specifically, subsection (3)(a) requires that the employer "actively and knowingly participate" in the employee's gross negligence or intentional misconduct. Fla. Stat. § 768.72(3)(a). Thus, the employer must be an active participant in the same intentional misconduct or gross negligence as the employee, not simply a bystander.[1] Not only must the employer engage in the intentional misconduct or gross negligence, but the employer must be a *knowing* participant in that punitive conduct. In other words, the employer must have knowledge that the conduct is punitive and intentionally engage in that punitive conduct with the employee. This is clearly a direct liability standard and not a theory of vicarious liability. Under this subsection, punitive damages are being awarded directly against the employer for its own punitive misconduct, in conjunction with the employee's misconduct, when the employer actively and knowingly takes part in that intentional misconduct or gross negligence.

Further, Subsection (3)(c)[2] provides that the employer must have "engaged in conduct that constituted gross negligence … that contributed to the loss, damages, or injury suffered by the claimant." Thus, Subsection (3)(c) requires the employer to itself engage in conduct that amounts to "gross negligence" as defined under Subsection (2)(b) before punitive damages may be imposed against that employer. Subsection (2)(b) defines "gross negligence" to mean that "the defendant's conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct." Fla. Stat. § 768.72(2)(b). Therefore, at a minimum, an employer must be "personally guilty" of "gross negligence" under Subsection (2)(b) to be found liable for punitive damages based on the acts of its employee under Subsection (3), and the employer's gross negligence must have actually contributed to the loss or injury that forms the basis of the claim for punitive damages. Under no reasonable interpretation could the imposition of punitive damages against an employer based on an employer's own gross negligence, which tangibly contributed to the subject loss, be regarded as vicariously awarded. In fact, Subsection 3(c) clearly shows the intent of the Legislature to overrule the "some fault" standard and thereby abolish the theory of

---

[1] In fact, the argument presented by Plaintiff in the underlying action was that Ranger's supervisor, Randy Scarberry, led Mr. Calero's flatbed tractor trailer across the median and told him to follow him, which resulted in the accident. Thus, Ranger was actively and knowingly participating in the same conduct as Mr. Calero. [*See e.g.* DE-91-2, p. 1378-1379].

[2] Absent from the Jury Instructions provided in the underlying matter were instructions pertaining to the standard of conduct for imposition of punitive damages under Fla. Stat. § 768.72(3)(b). [*See* DE 74-12]. The jury was only instructed on the standards articulated under § 768.72(3)(a) and (c), and therefore they are not discussed herein. [*See* DE 74-12].

6

vicarious liability against an employer in Florida. Specifically, by including "gross negligence" rather than "negligence", the Legislature made clear that it was overruling the standards set forth in *Mercury Motors* and *Schropp*, and the imposition of punitive damages now requires that the employer itself to engage in punitive conduct in order to be found directly liable for punitive damages. *Mercury Motors Express, Inc. v. Smith*, 393 So.2d 545 (Fla. 1981); *Schropp v. Crown Eurocars, Inc.*, 654 So. 2d 1158 (Fla. 1995).

Therefore, because Section (3) requires that the employer knowingly or actively participated in the punitive conduct, or itself acted with gross negligence, Fla. Stat. 768.72 provides only for the imposition of punitive damages directly against an employer either under Section (2) for their own "intentional misconduct" or "gross negligence" or under Section (3) when the employee's punitive conduct is essentially inseparable from the acts of the employer. Accordingly, pursuant to longstanding and well-settled Florida law, any award of punitive damages under Fla. Stat. 768.72 is not insurable as a matter of law. "Florida public policy prohibits liability insurance coverage for punitive damages assessed against a person **because of his wrongful conduct.**" *Queen*, 555 So.2d at 1266 (Fla. 2d DCA 1989). Here, regardless of whether the jury found Ranger liable under Section (2) or (3) of Fla. Stat. 768.72, the conduct that formed the basis of the punitive damage award was Ranger's own punitive conduct. Therefore, Ranger may not pass the burden of paying its penalty to an insurer when Ranger's own gross negligence or culpable conduct warranted the imposition of direct punitive damages.

**B.   THE JURY IN THE UNDERLYING CASE FOUND RANGER LIABLE FOR DIRECT PUNITIVE DAMAGES BY CLEAR AND CONVINCING EVIDENCE.**

A review of the trial transcripts from the underlying matter make it abundantly clear that Ms. Astaphan's counsel asked the jury to hold Ranger liable for its own punishable conduct—the type of misconduct which cannot be insured under Florida law. It was this argument and testimony on which the jury found by clear and convincing evidence that Ranger's gross negligence warranted the imposition of punitive damages directly against Ranger in the amount of $25,000,000.

For example, throughout the opening statement in the underlying case, Ms. Astaphan's counsel explained why Ranger's conduct warranted an award of punitive damages:

[On] May 2014, Ranger starts its construction project. Ranger Construction soon learns that its construction vehicles are making unsafe entries and exits to get on and off the highway. Motorists complain. The FDOT complains. Ranger's project manager, he knows about it. In

7

response Ranger writes a memo but does not deliver it to all truck drivers who work at that site. Ranger writes a couple of e-mails to its subcontractors and to its supervisors about this problem, and it fires a few truck drivers. But the problem doesn't go away.

[*See* Trial Transcript at DE 91-2, p. 1369-70; *see also* p. 1383]. Ms. Astaphan's counsel further told the jury that Ranger's conduct warranted punitive damages because Ranger's conduct was "beyond negligent", that Ranger, "knowingly and actively participated in the conduct of Juan Calero", and Astaphan's counsel specifically urged the jury to use the award of punitive damages against Ranger as a deterrent against this type of conduct in the future:

> You will hear that **Ranger Construction was beyond negligent here**. This was a type of **gross negligence for which punitive damages are needed to be certain that Ranger and anyone else in this industry will never, ever let this happen again**.
>
> First, **Ranger knowingly and actively participated in the conduct of Juan Calero**.
> …
> You will hear that Ranger knew. It knew what was going on. It received complaints, and it's Ranger's responsibility. We are suing Ranger Construction for all of those above reasons and for one more. Of the parties involved in this particular case, **Ranger is the one most able to prevent this from ever happening again. Not just back then, but now and into the future.**

[*Id.* at p. 1384-86](emphasis added).

During her closing argument in trial of the underlying matter, Ms. Astaphan's counsel consistently presented argument to the jury regarding Ranger's gross negligence and conscious disregard and indifference to human life in support of her request for punitive damages levied directly against Ranger. Specifically, Ms. Astaphan's counsel made the following statements to the jury during closing argument:

> When you, as a highway construction company [Ranger Construction] do what they did, create this kind of a scenario, **actively and knowingly participate in it, show indifference to human life and safety** for months leading up to this, not acknowledge on the witness stand as a company or as an individual that this is inherently dangerous activity, and to be flippant about it that the next day you're going to launch these vehicles and continue to launch them into the highway like that.

[*See* DE 91-2, p. 236 (3567)] (emphasis added). Indeed, Ms. Astaphan's entire case theory was about Ranger's "system failure" and Ranger's "conscious disregard and indifference to human life":

> This case is about an utter system failure. A system that barely existed for making sure that a thing like this would never, ever happen. … But before it became a system failure, it became a

8

disturbing degree of **corporate indifference**, of **conscious disregard and indifference to human life**.

[*Id.* at p. 3079] (emphasis added). Clearly, this level of conduct is not the "some fault" as discussed in *Schropp v. Crown Eurocars, Inc*., 654 So. 2d 1158 (Fla. 1995). Ms. Astaphan's counsel also told the jury that Ranger was directly responsible for the death of Jonathan Astaphan:

That is what we call actively and knowingly participating in conduct. Mr. Calero drove the tractor across the road, but it didn't just start and end with that move. **Ranger Construction and Mr. Scarberry set the table for him, and they actively and knowingly participated in his conduct.**

[*Id.* at p. 3079-84]. Furthermore, when Ms. Astaphan's counsel explained the verdict form, he again argued that Ranger was "beyond negligen[t]." [*Id.* at p. 3107]. And when he instructed the jury to apportion 50% fault to both Ranger and Juan Calero, he reiterated that "Ranger set the table":

"State the percentage of any negligence which is the legal cause of the death of Jonathan R. Astaphan that you charge."

And we suggest it's 50/50. **Ranger set the table. Ranger actively and knowingly participated in this conduct.**

[*Id.* at p. 3110].

When Ms. Astaphan's counsel discussed the verdict form on punitive damages, he made it clear that Ranger was grossly negligent, and he asked the jury to find Ranger liable for direct punitive damages:

Under the Circumstances of this case, whether you find by clear and convincing evidence that punitive damages are warranted against Juan Calero, **and the same question against Ranger Construction.**

That's what you do when there's gross negligence. That's what you do when you want to make sure. And when you do this, **now you're talking about not just deterrence but punishment to make sure that this will not just happen** – not happen on I-75, but not happen anywhere – not in this country, **not with Ranger** —— never, ever happen. Make it crystal clear.

[*Id.* at p. 3120]. Ms. Astaphan's counsel made it clear to the jury that they had been asked to use punitive damages as a "punishment" against Ranger and as a "deterrent" to Ranger and other construction companies in the industry. To eliminate any doubt that Ms. Astaphan sought direct

9

punitive damages against Ranger, Ms. Astaphan's counsel concluded his closing argument by again telling the jury that Ranger was indifferent and grossly negligent and set forth the reasons why:

**And Ranger is responsible like Calero.** Why? Because they created it. They actively and knowingly participated. If you put a list together of all the things that Ranger did – putting him there at nighttime, putting him there pointed north, putting him there with nine concrete barriers, putting him there without a lane closure, leading up to taking an adverse position to the motoring public and the truck drivers and never caring to do anything more out of corporate indifference to the life and safety – **Ranger itself has indifference and gross negligence.**

And it's also responsible for Mr. Calero because it actively and knowingly participated in making this happen.

It's time to tell them and Mr. Calero that this can't be tolerated. This can't be tolerated in our society. Thank you.

[*Id.* at p. 3120-21].

As clearly evidenced by the foregoing, the focus of Ms. Astaphan's counsel's argument was not on the conduct of Juan C. Calero or how Ranger should be vicariously liable for Mr. Calero's gross negligence. Rather, the clear intent of Ms. Astaphan was to invite the jury to enter an award against Ranger as a punitive measure for Ranger's "conscious disregard and indifference to human life" and for Ranger's "gross negligence" and "active and knowing participation" in conduct warranting punitive damages. The legal theory of *respondeat superior* and vicarious liability do not consist of accusations of the employer's conscious disregard and indifference to human life, nor do such theories require active and knowing participation in punitive conduct. The argument, evidence, and testimony presented to the jury at trial of the underlying matter specifically called upon the jury to enter a punitive damages award directly against Ranger for their own misconduct as a means of punishment for that conduct, and it was on this basis that the jury rendered its verdict.

**C. BASED ON THE ARGUMENT AND EVIDENCE PRESENTED, AS WELL AS THE JURY INSTRUCTIONS, THE *ASTAPHAN* JURY RETURNED A VERDICT FINDING THAT RANGER WAS DIRECTLY LIABLE FOR PUNITIVE DAMAGES.**

At the end of the underlying trial, the Court's instructions to the jury closely tracked the requirements of Fla. Stat. § 768.72(3)(a) & (c) for the imposition of direct punitive damages

10

against an "employer." [*See* Doc. 74-12]. In fact, the trial transcript reflects that the jury received the following instruction regarding Plaintiff's direct liability for punitive damages:

Ms. Astaphan claims that punitive damages should be awarded against Juan Calero for his gross negligence and against Ranger Construction Industries, Inc. [Plaintiff] for its active and knowing participation in Juan Calero's gross negligence or its gross negligence or both."

[*See* DE 74-12; DE 74-13 at p. 3]. The jury concluded that Ranger was 50% at-fault (directly liable) for the wrongful death of Jonathan Astaphan, with 50% also allocated to Juan Calero. [DE 74-3]. Perhaps most importantly, the jury answered "Yes" to the question of whether "[u]nder the circumstances of this case, state whether you find **by clear and convincing evidence** that punitive damages are warranted against RANGER CONSTRUCTION INDUSTRIES." (Question #11). [DE 74-3](emphasis added). The jury separately answered "Yes" in response to the inquiry regarding whether punitive damages were warranted against Juan C. Calero. (Question #10). [*Id.*]. Thus, through its answer on almost identical verdict interrogatories, the jury specifically found by clear and convincing evidence that punitive damages were specifically warranted directly against Ranger, as well as Ranger's employee, Juan C. Calero. These verdict questions and the jury's answers to these questions are significant. The requirement that punitive damages can be awarded only upon a showing of "clear and convincing evidence" is not found in § 768.72(3). Rather, the "clear and convincing evidence" standard is found only under Fla. Stat. § 768.72(2), which permits an award of punitive damages directly against a defendant for that defendant's "intentional misconduct" or "gross negligence." Clearly, the jury awarded punitive damages against Ranger based on its own punitive conduct.

Ultimately, the verdict form contained the names of both defendants – Ranger and Juan Calero – and allowed for the direct imposition of punitive damages against each based on their respective net worth. [DE 74-3]. Specifically, the jury found that $25,000,000 in punitive damages should be assessed directly against Ranger, and that an award of $5,000 in punitive damages should be assessed directly against Juan C. Calero. [*Id.*]. Common sense and logic dictate that by entering **separate awards** for **separate amounts** against Ranger and Juan C. Calero, the jury did not intend to find Ranger vicariously liable for the punitive award entered against Juan Calero. Rather, the jury specifically assessed Ranger's net worth in order to ascertain an amount of punitive damages appropriate to punish Ranger for its own misconduct based on its own financial status wholly independent from Juan C. Calero's financial status.

11

Further, notably absent from the jury's verdict is any indication that the jury intended to base its award of punitive damages against Ranger on the conduct of Juan C. Calero. The jury's verdict rendered in this case indisputably reflects an award of direct punitive damages against Ranger, as well as a separate award of direct punitive damages against Juan C. Calero. Ranger cannot escape responsibility for its own actions and conduct by attempting to couch the jury's award of punitive damages as vicarious when the jury clearly and explicitly considered Ranger's conduct and net worth in entering such an award as a means of deterrent and punishment against Ranger. Based on the foregoing, summary judgment should be entered in favor of AWAC because, as a matter of law, the punitive damages assessed in the underlying matter were directly against Ranger, and therefore, are not insurable under Florida law. Accordingly, AWAC is entitled to summary judgment in its favor.

### III. AWAC IS ENTITLED TO SUMMARY JUDGMENT AS TO RANGER'S BREACH OF CONTRACT CLAIM BECAUSE THERE IS NO DUTY TO SETTLE UNDER THE POLICY.

Ranger is attempting to rewrite the Policy in order to impose duties on AWAC which do not exist under the Policy. Despite Ranger's contentions otherwise, the mutual duty to cooperate does not equate to a duty to settle under the Policy. Instead, under Section I "INSURING AGREEMENT" the Policy provides as follows with regard to payment under the Policy:

Subject to all the warranties, terms, conditions, exclusions and limitations applicable to this policy, the company shall pay, on behalf of the insured, that part of loss, to which this policy applies, which exceeds the applicable underlying limits. This policy does not provide coverage for any part of loss within underlying limits, or any related cost or expenses.

[DE 12-6 at p. 18]. The Policy specifically defines "loss" (as used in the above paragraph) as "damages that the insured becomes legally obligated to pay because of injury or damage. . ." [DE 1-8 at p. 23]. Thus, the Policy provides that AWAC "shall pay" that part of the "damages that the insured becomes legally obligated to pay" pursuant to the "warranties, terms, conditions, exclusions and limitations" of the Policy. [*Id.*]. The "legal obligation to pay" under the express terms of the policy has been interpreted by Florida courts as an insurer's duty to indemnify. *See U.S. Fire Ins. Co. v. Mikes*, 576 F. Supp. 2d 1303, 1318-1319 (M.D. Fla. 2007*)*. Further, under Florida law, the duty to indemnify is dependent upon the entry of a final judgment, settlement, or a final resolution of the underlying claims by some other means. *See Travelers Ins. Co. v. Waltham Indus. Lab. Corp.*,883 F.2d 1092,1099 (1st Cir.1989). Unless the insured can

demonstrate that it suffered a covered loss under the policy, the insurer has no duty to indemnify whatsoever. *Celotex Corp. v. AIU Ins. Co.*, (In re Celotex Corp.), 152 B.R. 661 (Bankr.M.D.Fla.1993). Because an insurer's duty to indemnify is dependent on the outcome of a case, any declaration as to the duty to indemnify is premature unless there has been a resolution of the underlying claim. *Bankwest v. Fidelity & Deposit Co. of Md.*, 63 F.3d 974, 981–82 (10th Cir.1995); [*See* Doc. 76]. Thus, the Policy specifically sets forth the obligations with regard to payment of the damages caused by its insured and nowhere does the Policy provide that AWAC is required to "initiate settlement discussions" or "accept reasonable settlement opportunities." Thus, as a matter of law, AWAC cannot breach the Policy by "failing to initiate settlement negotiations" or "accept reasonable settlement opportunities" as there is no provision in the insurance contract which obligates AWAC to do so. *See Landress Auto Wrecking Co. v. U.S. Fid. & Guar. Co.*, 696 F.2d 1290, 1292 (11th Cir. 1983)(stating that "if the language of a policy is clear and unambiguous, it should be accorded its natural meaning"). Based on the foregoing, as a matter of law, AWAC is entitled to summary judgment as to the allegations of failure to "initiate settlement discussions" and "accept reasonable settlement offers" within Counts I and II of Ranger's Amended Complaint.

**A.   AS A MATTER OF LAW AND UNDER THE TERMS OF THE POLICY, MUTUAL COOPERATION DOES NOT INCLUDE A DUTY BY AWAC TO SETTLE THE CLAIMS AGAINST RANGER.**

Ranger's position is that the "DEFENSE AND SUPPLEMENTARY PAYMENTS" provision of the Policy required AWAC to "initiate settlement negotiations" and "accept reasonable settlement opportunities." However, Ranger's argument fails based on the clear terms of the Policy and based on Florida law. Essentially, Ranger is attempting to strain the interpretation of the term "cooperation" to include duties which do not exist under Florida contract law, and which only exist under Florida bad faith law. Specifically, Ranger relies on Section II "DEFENSE AND SUPPLEMENTARY PAYMENTS" of the Policy which states in relevant part:

If the company does not exercise such a right or if the applicable underlying limits are not exhausted, the company will have the right, and will be given the opportunity, to associate effectively with the insured or any underlying insurer, or both, in the investigation, settlement or defense of any claim, suit or proceeding that is likely to involve this policy. *In such event, the insured, the underlying insurer, and the company shall cooperate in the investigation, settlement or defense of such a claim, suit or proceeding.*

[*See* DE 12-6 at pp. 18-19; Section II.B of the Policy] (emphasis added). This provision provides that, if AWAC exercises its right to "associate effectively" in the investigation, settlement or defense of a claim, then **AWAC, Ranger, and the underlying insurer "shall cooperate in the investigation, settlement or defense of such a claim, suit or proceeding**." [*Id.*](emphasis added). Thus, it is Ranger's position that the term "cooperation" includes a duty by AWAC to "initiate settlement negotiations" and "accept reasonable settlement opportunities." However, Ranger ignores the fact that the plain meaning of the "DEFENSE AND SUPPLEMENTARY PAYMENTS" provision of the Policy imposes a *mutual* duty to cooperate between AWAC, Ranger, and the underlying insurer in the investigation, settlement or defense of such a claim, suit or proceeding. There is no separate provision in the Policy which provides that AWAC must "initiate settlement negotiations" or "accept reasonable settlement opportunities." Nor is there any provision in the Policy that imposes a "duty to settle" on AWAC. Further, the term "cooperation", based on its plain meaning, does not mandate payment of the policy limits or require AWAC to initiate settlement negotiations. In fact, AWAC was unable to find a single case which stands for that proposition. Instead, cooperation clauses typically provide that the *insured* must cooperate with the insurer and on the insurer's request: must attend hearings and trials, as well as assist in securing and giving evidence and obtaining attendance of witnesses. *See e.g. American Fire & Cas. Co. v. Collura*, 163 So. 2d 784 (Fla. 2d DCA 1964); Black's Law Dictionary (10th ed. 2014)(defining a cooperation clause as "a policy provision requiring that the insured assist the insurer in investigating and defending a claim."). Because of an insurance company's right to control the defense of a claim, insurance policies often include a cooperation clause giving the insurer "unfettered cooperation from its insured, and a right to be free from any interference in defending or settling a claim." *Cont'l Cas. Co. v. City of Jacksonville*, 550 F. Supp. 2d 1312, 1339 (M.D. Fla. 2007), *aff'd*, 283 F. App'x 686 (11th Cir. 2008). "Unlike a bad faith action where an insured seeks damages for the insured's breach of its duty to settle, cooperation clause cases are usually brought by an insurer who seeks to be excused from indemnifying its insured because its insured breached its duty to cooperate." *Id.* at 1338-39. One of the main purposes for a cooperation clause is to "protect the insurer from collusion between the insured and injured third parties, while making it possible for the insurer to conduct a proper investigation of the claim, and determine its own obligations." *Continental Cas. Co.*, 550

F.Supp.2d at 1339. "Failure of an insured to cooperate with his insurer will release the insurer from liability if the failure constitutes a material breach and substantially prejudices the rights of the insurer to defend the case." *Rustia v. Prudential Property & Cas. Ins. Co.*, 440 So. 2d 1316, 1317 (Fla. 3d DCA 1983). However, "cooperation" does not mandate that an insurer must "initiate settlement negotiations" or "accept settlement offers" and AWAC is unaware of any Florida case which holds as such. Thus, Ranger's attempts to allege that AWAC breached the contract with regard to its handling of settlement is precluded by the express terms of the Policy. *See Landress Auto Wrecking Co. v. U.S. Fid. & Guar. Co.*, 696 F.2d at 1292.

B.  **AS A MATTER OF LAW, THE DUTY TO DEFEND DOES NOT INCLUDE A DUTY BY AWAC TO SETTLE THE CLAIMS AGAINST RANGER.**

Additionally, Ranger alleges that an insurer's "duty to defend" includes a requirement for AWAC to "initiate settlement discussions" and "accept reasonable settlement offers." However, this argument is also unsupported by Florida law. In Florida, "the general rule is that an insurance company's duty to defend an insured is determined solely from the allegations in the complaint against the insured, not by the actual facts of the cause of action against the insured, the insured's version of the facts or the insured's defenses." *Composite Structures, Inc. v. Cont'l Ins. Co.*, 560 F. App'x 861, 864 (11th Cir. 2014)(citing *Amerisure Ins. Co. v. Gold Coast Marine Distribs., Inc.,* 771 So.2d 579, 580–81 (Fla. 4th DCA 2000). The duty to defend is of greater breadth than the insurer's duty to indemnify, and the insurer must defend even if the allegations in the complaint are factually incorrect or meritless. *James River Ins. Co. v. Arlington Pebble Creek, LLC*, 188 F. Supp. 3d 1246, 1255 (N.D. Fla. 2016). Additionally, "[t]o satisfy its obligation to defend, an insurer … must provide an adequate defense" and an insurance company provides an adequate defense when it appoints "competent and qualified" counsel. *Kapral v. GEICO Indem. Co.*, 723 F. App'x 768, 770 (11th Cir. 2018)(emphasis in original).[3] Thus, under Florida law, the duty to defend requires an insurer to defend its insured in a covered lawsuit and provide that insured with an adequate defense. The duty to defend does not, however, impose a duty to "initiate settlement negotiations" or "accept settlement opportunities."

For example, in *Jimenez*, the court addressed a similar issue concerning a breach of contract claim brought against an insurer. *See Jimenez v. Government Employees Ins. Co.*, 2014

---

[3] There is no allegation in Plaintiff's Amended Complaint or raised in this action that Ranger did not have competent and qualified counsel.

15

WL 5810466 (M.D. Fla. Nov. 7, 2014). In granting summary judgment for the insurer as to the breach of contract count, the Court determined that the subject insurance policy did "not impose a contractual duty on the [insurer] to settle a claim" as "the plain language of the Policy only requires the [insurer] to pay damages and defend the suit." *Id*. at *3. Further, the *Jimenez* Court determined that the insured's failure to settle claim was appropriately brought under a cause of action for bad faith. *Id.* at 4. Similar to *Jimenez*, the language of the subject Policy does not obligate AWAC to settle claims. To find that this duty to settle is somehow subsumed within the duty to defend would undermine the parties' rights and obligations provided by the express language of the Policy.

C. **PLAINTIFF'S ALLEGATIONS REGARDING "FAILING TO INITIATE SETTLEMENT DISCUSSIONS" AND "ACCEPT REASONABLE SETTLEMENT OFFERS" ARE SUBSUMED WITHIN RANGER'S ABATED BAD FAITH CLAIM.**

While the duties to "initiate settlement discussions" and "accept reasonable settlement offers" are not included anywhere in the terms or language of the Policy, these duties are explicitly included in Florida's common law duty of good faith. *See* Fla. Std. Jury. Inst. 404.4. In addition, the Florida Supreme Court has specifically articulated that an insurer owes a duty of good faith "to advise the insured of settlement opportunities, to advise as to the probable outcome of the litigation, to warn of the possibility of an excess judgment, and to advise the insured of any steps he might take to avoid same." *Boston Old Colony Insurance Co. v. Gutierrez*, 386 So.2d 783, 785 (Fla. 1980). Similarly, the duty to "initiate settlement negotiations", as referenced in Count I and II, is likewise a duty of good faith rather than a specific contractual obligation. *Powell v. Prudential Property & Cas. Ins. Co.*, 584 So.2d 12, 14 (Fla. 3d DCA 1991) ("Where liability is clear, and injuries so serious that a judgment in excess of the policy limits is likely, **an insurer has an affirmative duty to initiate settlement negotiations**.")(emphasis added). At common law in Florida, the essence of a bad faith cause of action against an insurance company (whether brought by the insured or the injured party), is that the insurer breached its duty owed to its insured by wrongfully refusing to settle the case within the policy limits, and thereby exposed its insured to a judgment which exceeds the liability insurance limits provided by the policy. *Dunn v. Nat'l Sec. Fire & Cas. Co.*, 631 So. 2d 1103, 1106 (Fla. Dist. Ct. App. 1993) *Fidelity and Casualty Co. of New York v. Cope,* 462 So.2d 459 (Fla.1985). In other words, an action based on the insurer's breach of the duty to its insured to

16

make a good-faith offer of settlement within the policy limits so as to avoid exposing the insured to an excess judgment is a bad faith action, not a breach of contract action. *Thomas v. Lumbermens Mut. Cas. Co.*, 424 So. 2d 36 (Fla. Dist. Ct. App. 1982). To hold otherwise is contrary to the Florida law, the Policy and could result in inconsistent verdicts. Thus, any allegation regarding AWAC's purported failure to settle is actually a claim for bad faith under Florida law.

Further, regardless of the Plaintiff's attempts to disguise its claims as "breach of contract" and "declaratory judgment", it is clear that Plaintiff is seeking recovery of an excess judgment that allegedly resulted from AWAC's "failure to settle" a claim and, as such, is clearly a claim for bad faith. *See Campbell*, 306 So.2d 525, 530-531. Here, Plaintiff's breach of contract claim, as alleged in the Amended Complaint specifically seeks the full amount of the excess judgment against AWAC. [DE 12, pg. 10; *see also* DE 12, pg. 14; *see also* Ex. __]. However, under Florida law "any duty to defend in excess of the policy limits, by its very definition, could not include a claim for breach of the contract because the insurance contract would only provide for insurance benefits within its policy limits. **It is only through acts constituting bad faith that an insurer is obligated to pay in excess of the policy limits**." *Gov't Employees Ins. Co. v. Prushansky*, 2012 WL 6103220, at *4 (S.D. Fla. Dec. 7, 2012)(emphasis added). A breach of contract claim can only be brought when it "can be determined objectively from the insurance contract itself without inquiry into whether the insurer acted in good faith or bad faith." *See Carrousel Concessions, Inc. v. Florida Ins. Guar. Ass'n*, 483 So. 2d 513, 516 (Fla. Dist. Ct. App. 1986). Here, a determination of Plaintiff's breach of contract or declaratory judgment claim requires a determination of whether AWAC acted in bad faith. Thus, because the allegations in Counts I and II of the Plaintiff's Amended Complaint are simply mislabeled claims for bad faith, AWAC is entitled to summary judgment in its favor.

**WHEREFORE,** AWAC respectfully requests that this Honorable Court enter an Order granting AWAC's Motion for Summary Judgment as to Counts I and II of Ranger's Amended Complaint and granting such further relief this Court deems just and proper.

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 18th day of March 2019, I electronically filed the foregoing document with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service

List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

    s/ B. RICHARD YOUNG
**B. RICHARD YOUNG**
Florida Bar No.: 442682
bryoung@flalawyer.net
**MICHAEL T. BILL**
Florida Bar No.: 997722
mbill@flalawyer.net
**ADAM A. DUKE**
Florida Bar No.: 55734
aduke@flalawyer.net
**MEGAN ALEXANDER**
Florida Bar No.: 58883
malexander@flalawyer.net
**RICHARD A. WELDY**
Florida Bar No.: 111811
rweldy@flalawyer.net
Young, Bill, Boles, Palmer,
Duke & Thompson, P.A.
One Biscayne Tower, Suite 3195
2 South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 222-7720
Facsimile: (305) 492-7729
Attorneys for Defendant

**SERVICE LIST**
**RANGER CONSTRUCTION INDUSTRIES, INC vs. ALLIED WORLD NATIONAL ASSURANCE COMPANY**
**CASE NO.: 9:17-CV-81226**

**WALTER J. ANDREWS, ESQ.**
**ANDREA L. DEFIELD, ESQ.**
**DANIEL HENTSCHEL, ESQ.**
**Hunton & Williams LLP**
1111 Brickell Avenue, Suite 2500
Miami, FL 33131
Wandrews@HuntonAK.com
Adefield@HuntonAK.com
Dhentschel@HuntonAK.com
*Via CM/ECF*